In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3144

ARTHUR J. BRYANT,

*Petitioner-Appellant*,

*v.*

RICHARD BROWN,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:13-cv-00218-WTL-WGH — **William T. Lawrence**, *Judge*.

ARGUED JANUARY 4, 2017 — DECIDED OCTOBER 23, 2017

Before POSNER,[*] EASTERBROOK, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Arthur John Bryant, an Indiana prisoner, was convicted of murdering his stepmother. He was 17 years old at the time of the killing. Under Indiana law juveniles in police custody have a statutory right to "mean-

---

[*] Circuit Judge Posner retired on September 2, 2017, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

ingful consultation" with a parent before waiving their constitutional rights. *See* IND. CODE § 31-32-5-1. Bryant met with his mother and made an incriminating statement to her. Two detectives surreptitiously recorded their conversation, and the incriminating statement was introduced at Bryant's trial through the testimony of both eavesdropping officers. Bryant's counsel objected to the first detective's testimony but the objection was overruled. On direct appeal the Indiana Court of Appeals held that the statement should not have been admitted, but because Bryant's counsel did not object to the *second* detective's testimony about the same statement, the error was both unpreserved and effectively harmless.

On state postconviction review, Bryant raised a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). He identified five errors, including his counsel's failure to preserve the surreptitious-recording issue and several other alleged missteps at trial. In a separate claim, he raised a *Brady* violation stemming from a falsehood in a police report. Finally, in a catch-all argument, he claimed a right to relief based on cumulative error.

The trial judge was not persuaded by these arguments. Neither was the Indiana Court of Appeals. Bryant then sought federal habeas relief under 28 U.S.C. § 2254, reiterating the same claims. The district court denied relief, and we affirm the judgment. The state appellate court reasonably applied *Strickland* and *Brady*.

## I. Background

On January 4, 2000, Carol Bryant went missing. A few days later the police discovered her body in the trunk of her

abandoned car. At the time of her death, Carol was living with her husband, Lee Bryant, at their home in Harrison County in southern Indiana. Lee's 17-year-old son, Arthur John Bryant, also lived with the couple; to avoid confusion we'll refer to him as "Bryant" and use first names for other family members.

Bryant had previously lived with his mother, Kristi, but she kicked him out because she could no longer control his behavior. Among other things, he stole her truck, threatened to kill her, chased her around the house with a baseball bat, and choked her.

On the day of Carol's disappearance, Lee came home midday to have lunch with his wife and son, then went back to work. When he returned home that evening, both Carol and Bryant were gone. Lee found a note from Bryant saying he was spending the night at a friend's house. Lee called Carol's family and friends in search of her, but no one knew where she was. When morning came without word from her, Lee reported her missing.

Meanwhile, Bryant was driving around in Carol's car, showing it off to friends. He had stolen her jewelry, some of which he sold to a pawnshop; the rest he gave away. After several days he abandoned the stolen car on the side of a rural road. When police recovered and searched it, they found Carol's body in the trunk wrapped in a comforter. She had been strangled. Police also found a pair of Bryant's jeans in the trunk. The jeans were stained with bodily fluids. DNA analysis later confirmed that the bodily fluids were Carol's.

Detectives soon learned that Bryant had an angry relationship with his stepmother. They discovered some rap

lyrics he had written describing Carol in profane terms and discussing a plan to kill a woman and leave her body in the trunk of a car.

On January 8 sheriff's deputies located Bryant in a nearby town and arrested him for Carol's murder. When they arrived at the Harrison County Sheriff's Office, Bryant asked for a lawyer. In the meantime, he was allowed to meet with his mother in accordance with an Indiana statute that gives juveniles in custody the right to consult with a parent before waiving their constitutional rights. *See* IND. CODE § 31-32-5-1. Sheriff's Detectives Richard Bauman and William Whelan secretly eavesdropped on the conversation using a hidden recording device. They overheard Bryant tell his mother: "I told dad I had a problem and if he didn't take care of it, I would, and I did."

The investigation continued after Bryant's arrest. Detective Bauman interviewed Carol's friend Tracy Beemer (neé Borden), who told him that Carol had confided to her that Lee was abusive and had threatened to kill her. She also told the detective that she and Carol had contacted domestic-violence shelters a few days before Carol's death. Detective Bauman's report wrongly stated that Beemer told him that Carol had identified Bryant, not Lee, as her abuser. The prosecution disclosed this report to the defense before trial. Bryant's defense team—he had two attorneys—did not follow up by interviewing Beemer.

Bryant stood trial for murder, theft, and obstruction of justice. Some factual detail about the trial is necessary to understand the issues raised in this appeal. The prosecution called both Detective Bauman and Detective Whelan as witnesses. The detectives testified about Bryant's incriminat-

ing statement to his mother at the Sheriff's Office. Bryant's counsel objected to this line of questioning during Detective Bauman's testimony, raising the statutory violation. The objection was overruled. Bryant's counsel did not reiterate the objection when Detective Whelan testified on the same subject.

As relevant here, the prosecution also called Alice Alcorn, a friend of Carol's. She testified that Bryant told her he would kill Carol before he turned 18. This aspect of her testimony came as a surprise to everyone; Alcorn had not previously disclosed this information to the prosecution team.

Bryant's defense at trial was to point the finger at Lee as the real killer. Bryant took the stand in his own defense and told the jury that on the day of Carol's disappearance, he left the house in the middle of lunch because she and Lee were fighting. He testified that he returned a short while later to find Lee standing over Carol's dead body. Lee told him to "take care of this," and Bryant left the home in Carol's car with her body in the trunk. He admitted that he drove around for several days with her body in the trunk before abandoning the car on the side of a road. He also admitted that he stole her jewelry, pawned some of it, and gave away the rest. Finally, he acknowledged that his relationship with his stepmother was strained and at times angry.

Before trial the judge had granted a defense motion to exclude evidence of Bryant's threats and violence against his mother, Kristi. As Bryant's testimony unfolded, the jury submitted a question asking why he went to live with his father. Bryant's counsel objected based on the court's pretrial ruling, and the judge sustained the objection.

The next day, however, during the direct examination of Bryant's parole officer, Stephanie Ringer, defense counsel returned to this subject, asking Ringer why Bryant went to live with his father. She replied that his mother had kicked him out of her house because he stole her truck. Later when the defense called Kristi as a witness, the prosecutor cross-examined her about the other reasons why she kicked her son out—namely, that he had threatened her, chased her with a baseball bat, and choked her. Over Bryant's objection the judge allowed this line of questioning, ruling that the defense had opened the door by asking Ringer why Bryant went to live with his father.

Ringer also testified about Bryant's prior convictions. During Bryant's testimony, he had been impeached with his prior convictions; the defense team put the parole officer on the stand to supply some context. The jurors submitted a question asking what specific crimes he was on parole for. The question was allowed without objection. Ringer responded that he was on parole for theft, burglary, and a weapons offense.

The jury found Bryant guilty as charged. On direct appeal he challenged the admission of Kristi's testimony about his threats and violence toward her. He also challenged the admission of his incriminating statement to his mother based on the detectives' violation of his statutory right to meaningful consultation with a parent.

The Indiana Court of Appeals rejected these arguments and affirmed. The court agreed with the trial judge that the defense had opened the door to Kristi's testimony about her son's violent behavior by asking Ringer why Bryant went to live with his father. The court reasoned that excluding this

line of cross-examination would have left the jury with the false impression that Kristi kicked her son out solely because he had stolen her truck. The court also held that the covert recording of the conversation between Bryant and his mother violated his statutory right to parental consultation, so the judge should have sustained the objection to the admission of Detective Bauman's testimony about Bryant's incriminating statement. But because the defense did not object to Detective Whelan's identical testimony, the court held that the issue was waived, or at least not a reversible error. In other words, because Detective Bauman's erroneously admitted testimony essentially duplicated Detective Whelan's unchallenged testimony on the same subject, the error was both unpreserved and harmless.

Bryant then sought state postconviction relief based on ineffective assistance of counsel. He raised five alleged errors by his trial attorneys: (1) the failure to object to Detective Whelan's testimony regarding his incriminating statement to his mother; (2) the failure to impeach Alcorn after she unexpectedly testified about his threat to kill Carol; (3) the failure to object to Ringer's testimony regarding his prior convictions; (4) opening the door to evidence about his violence and threats against his mother; and (5) the failure to interview Beemer, whose testimony regarding Lee's abuse of Carol might have supported the defense that Lee was the killer. Bryant also asserted that Detective Bauman's misleading police report about Beemer's statement violated *Brady v. Maryland*, 373 U.S. 83 (1963). Finally, he argued that the combined effect of these errors warranted relief under the cumulative-error doctrine.

The trial judge rejected each of these claims, and the Indiana Court of Appeals affirmed. Bryant's trial attorneys testified at the postconviction hearing that the challenged decisions could not be characterized as strategic trial judgments. The appellate court discounted this testimony as the product of hindsight bias and reasoned instead that the decisions in question all dealt with matters of trial strategy. The court concluded that the performance of Bryant's defense team was not objectively unreasonable when evaluated as of the time the decisions were made.

For two of the five alleged errors, the appellate court also addressed the question of prejudice under *Strickland*. The court noted that the failure to object to Detective Whelan's testimony about Bryant's incriminating statement was not prejudicial in light of the abundant evidence of his guilt. The court also held that the failure to interview Beemer was not prejudicial because her testimony about Carol's statements would have been inadmissible hearsay.

The court rejected Bryant's *Brady* claim as well, noting first that the prosecution had disclosed Detective Bauman's report about his interview with Beemer, so the defense team was aware that she was a potential witness and could have discovered her true account of Lee's abuse. The court also held that because Beemer's testimony about Carol's statements to her would have been excluded as hearsay, the misleading police report was ultimately immaterial. And because there was no error at all, much less multiple errors, the court rejected Bryant's claim of cumulative error.

Bryant then moved for federal habeas relief under § 2254, asserting the same *Strickland* and *Brady* claims. The district judge denied the motion, concluding that the state appellate

court reasonably applied the *Strickland* standard to each of Bryant's claims. The judge faulted the state court's conclusion that the failure to interview Beemer was not deficient performance; that ruling, the judge thought, was unreasonable. But because the state court reasonably concluded that this error was not prejudicial, the judge found no basis for relief on any aspect of Bryant's *Strickland* claim. The judge also concluded that the state appellate court reasonably applied *Brady*.

## II. Discussion

The state courts adjudicated Bryant's *Strickland* and *Brady* claims on the merits, so our review is governed by § 2254(d)'s deferential standard. A federal habeas court may not grant relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). This standard requires the habeas petitioner to show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ward v. Neal*, 835 F.3d 698, 703 (7th Cir. 2016) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

### A. Ineffective Assistance of Counsel

The familiar *Strickland* standard for Sixth Amendment claims of ineffective assistance of counsel considers whether counsel's performance was deficient and, if so, whether the deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). The first step in this

framework asks "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. The prejudice inquiry asks whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Because "[t]here are countless ways to provide effective assistance," *Strickland* established a "strong presumption that counsel's representation falls within a wide range of reasonable representation." *Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016) (quoting *Strickland*, 466 U.S. at 689–90). The deferential nature of the *Strickland* standard, combined with the deference owed state-court decisions under § 2254(d), means that our review is "doubly deferential." *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

**1.** *Failure to Preserve the Surreptitious-Recording Issue*

The state appellate court held that counsel's failure to object to Detective Whelan's testimony about Bryant's incriminating statement to his mother did not fall outside the range of competent representation. The court reasoned that the decision to make or withhold an objection is ordinarily a matter of trial strategy and often depends on factors unrelated to the merits—to avoid irritating the jury, for example, or to refrain from highlighting unfavorable evidence or creating the impression that the defendant has something to hide. The court also held that even if the failure to object fell below the constitutional standard, it was not prejudicial given the overwhelming evidence of Bryant's guilt.

That was not an unreasonable way to resolve this aspect of Bryant's *Strickland* claim. In hindsight the lack of an

objection seems significant; after all, the appellate court said it was error to admit Bryant's incriminating statement based on the detectives' violation of his statutory right to parental consultation. But the court also found no reasonable probability of a different outcome, both because the error was ultimately harmless and the evidence of Bryant's guilt was plentiful. The court's no-prejudice ruling is well within the bounds of § 2254(d) reasonableness.

**2.  *Failure to Impeach Alcorn***

The state appellate court also reasonably concluded that the decision to forgo impeachment of Alice Alcorn was a matter of trial strategy. A "decision not to impeach a particular witness is normally considered a strategic choice within the discretion of counsel." *Jones v. Butler*, 778 F.3d 575, 584 (7th Cir. 2015). That is especially true here because it is far from clear that any impeachment would have been successful. Alcorn's trial testimony about Bryant's threat to kill Carol was a surprise to everyone. Her reasons for not reporting this to the prosecution team before trial were unknown. For all anyone knew, she may have had a good reason for not revealing this information sooner. And any impeachment attempt would have drawn more attention to this damaging testimony. Instead Bryant's counsel limited his cross-examination to Alcorn's knowledge of Lee's abuse of Carol— the foundation of Bryant's primary defense theory. The state court reasonably characterized that approach as strategic and within the norms of professional competence.

### 3. *Failure to Object to Ringer's Testimony About Bryant's Prior Convictions*

Bryant's counsel did not object to the jury's inquiry during Ringer's testimony about the specific crimes for which Bryant was on parole. Once again the state court held that this decision was a matter of trial strategy and not outside the range of competent representation. The court noted that it was important to avoid the appearance that Bryant had something to hide and to build the jury's trust and receptiveness to Bryant's version of events. These strategic goals are especially strong in the face of a question posed by the jury itself. It was not unreasonable to conclude that counsel's choice to withhold objection was within the range of professional competence.

### 4. *Opening the Door to Kristi's Testimony About Bryant's Violent Behavior and Threats*

Bryant's defense team obtained a pretrial order excluding evidence of his violent behavior and threats against his mother. But this evidence came in anyway when the trial judge ruled that Bryant's counsel had opened the door to it during Ringer's direct examination. At the postconviction hearing, the attorney testified that she did not think her examination of Ringer opened the door. Evidence of Bryant's criminal history and fraught relationships with his family was already before the jury through his own testimony; putting his parole agent on the stand was intended to provide some explanatory context. Counsel explained that at the time of trial, she did not think Ringer's answer to the question about why Bryant was kicked out of his mother's home—he had stolen her truck—would risk admission of his violent altercations with his mother.

Again, in hindsight this line of questioning was a mistake. But the state appellate court found it to be a reasonable strategic choice—not without risk certainly, but not outside the bounds of professional competence either. On § 2254(d) review, we cannot disturb a state-court judgment unless the ruling was so far afield that no fair-minded jurist could find it reasonable. *Richter*, 562 U.S. at 103. We can't say that about this ruling. A fair-minded judge could conclude that Bryant's counsel reasonably thought that she could contain the scope of this line of questioning—in other words, that it was possible to put before the jury a partial explanation for why Bryant was kicked out of his mother's house without risking admission of evidence of his more violent behaviors. Errors resulting from strategic miscalculations may fall within the wide range of competent representation. It was not unreasonable for the state appellate court to characterize counsel's decision in that way.

### 5. *Failure to Interview Beemer*

Finally, the state appellate court concluded that the decision not to interview Tracy Beemer was not constitutionally deficient. A "heavy measure of deference" is owed to an attorney's "particular decision not to investigate" certain witnesses. *Strickland*, 466 U.S. at 691. The state court gave the defense team the benefit of the doubt here. The court also found a lack of prejudice; even if Bryant's counsel had interviewed Beemer, her testimony about Carol's statements of spousal abuse would have been inadmissible hearsay. We see nothing unreasonable in this application of *Strickland*'s prejudice standard.

Before we move on, we pause to address a point Bryant raises about the testimony of his trial attorneys at the post-

conviction hearing. He makes much of the fact that both attorneys declined to characterize any of the challenged decisions as matters of trial strategy. But they also testified that they were concerned about over-objecting and wanted to avoid creating the impression that Bryant had something to hide. These are aspects of trial strategy.

More fundamentally, the Supreme Court has warned of the effects of hindsight bias in evaluating *Strickland* claims: "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome." *Richter*, 562 U.S. at 109. But *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* That Bryant's attorneys acknowledged making mistakes "merely [highlights] that the defense strategy did not work out as well as counsel had hoped, not that counsel was incompetent." *Id.*

## B. *Brady* Claim

The *Brady* rule holds that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. "Suppression" occurs when the prosecution "fail[s] to disclose evidence not otherwise available to a reasonably diligent defendant." *Jardine v. Dittmann*, 658 F.3d 772, 776 (7th Cir. 2011). And evidence is deemed "material" only when "a reasonable probability [exists] that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Bryant's *Brady* claim centers on Detective Bauman's police report about his interview with Tracy Beemer. The report stated that Beemer told him of Carol's complaints about abuse *by Bryant*, when what she really said was that Carol had confided in her about abuse *by Lee*. The state appellate court held that Beemer's actual statements were not suppressed in violation of *Brady* because they could have been discovered by trial counsel through reasonable diligence. The court also held that even if they were suppressed, the statements were not material because Beemer's testimony about what Carol told her was inadmissible hearsay.

Bryant characterizes the first holding as an unreasonable application of *Brady*. Even if we agreed, the court reasonably rejected the claim on materiality grounds, so relief under § 2254(d) is unwarranted. Bryant argues at length that Beemer's testimony about what Carol told her would have been admissible under Indiana's state-of-mind exception. *See* IND. R. EVID. 803(3). But that's a quarrel about the state court's ruling on a matter of *state* law and not a basis for § 2254 habeas relief. *Harper v. Brown*, 865 F.3d 857, 861 (7th Cir. 2017).

Without Carol's statements of spousal abuse, Beemer would have made a weak witness for the defense. It is not unreasonable to conclude that her residual testimony about the phone calls she made to domestic-violence shelters would not have had much impact on this trial without its underlying foundation. Considering the mountain of evidence pointing to Bryant's guilt, the state appellate court's materiality ruling was well within the bounds of reason.

## C.  Cumulative Error

After resolving each of Bryant's individual claims of error against him, the state court summarily rejected his argument about cumulative error. We do likewise.

ALL CAPS: AFFIRMED.